UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| LESSA S. HAYES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 2:12-00064 |
| v. ) | Judge Nixon/Brown |
| ) | |
| MICHAEL J. ASTRUE, COMMISSIONER ) | |
| OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

To: The Honorable John T. Nixon, Senior United States District Judge

## REPORT AND RECOMMENDATION

This action was brought under to 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record (DE 14) be **DENIED**, and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on January 19, 2010, and for SSI on April 8, 2011, alleging a disability onset date of August 28, 2009 as to both claims. (DE 10, pp. 19, 104, 111, 135) Plaintiff listed the following conditions that limited her ability to work: chronic fatigue, fibromyalgia, thyroid problems, sciatic nerve, breathing problems, degenerative disc disease, leaking heart valves, congestive heart failure (CHF), Barrett Esophagus, and high blood pressure. (DE 10, p. 140) Plaintiff's claims were denied on August 4, 2010, and again upon reconsideration on

February 14, 2011. (DE 10, pp. 45-55)

Plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ) on March 3, 2011. (DE 10, p. 63) A hearing was held on November 1, 2011 before ALJ K. Dickson-Grissom. (DE 10, pp. 31-34, 70-92) Vocational Expert (VE) Anne B. Thomas testified at the hearing. (DE 10, pp. 93-95, 41-43)

The ALJ entered an unfavorable decision on January 31, 2012, holding that plaintiff had not been under a disability as defined in the Act from August 28, 2009 through the date of the decision. (DE 10, pp. 16-26) Plaintiff filed a request with the Review Council on February 16, 2012 to review the decision. (DE 10, pp. 12-15) The Appeals Council denied plaintiff's request on May 30, 2012, whereupon the ALJ's decision became the final decision of the Commissioner. (DE 10, pp. 1-6)

Plaintiff through counsel brought this action on July 9, 2012 seeking judicial review of the Commissioner's decision. (DE 1) Thereafter, plaintiff filed a motion for judgment on the administrative record on November 19, 2012. (DE 14) The Commissioner responded on February 4, 2013. (DE 18) There was no reply. This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

The medical records in this case are voluminous – six hundred ninety-six pages to be exact. The records are summarized below.

• Four reports from Cookeville Neurology written by Dr. Thuy Ngo, M.D. during the period September 18, 2007 to February 3, 2010. (DE 10, pp. 238-41)

Dr. Ngo noted on August 18, 2007 that, based on plaintiff's complaints, and what she told him she had been told by other doctors, plaintiff had "suspect[ed] . . . pseudo-sciatica," sleep apnea, neck and shoulder pain, and benign essential tremor. (DE 10, p. 241)

Dr. Ngo noted on May 21, 2008 that, based on "two pages of symptoms" provided by plaintiff, she had chronic fatigue, nonrestorative sleep quality, pain and stiffness, "mild nonspecific encephalopathy,"[1] "generalized myofascial[2] pain disorder," depression and anxiety disorders. (DE 10, p. 240) Dr. Ngo also noted that a recent MRI of plaintiff's head was normal. (DE 10, p. 240)

Dr. Ngo noted on August 21, 2009 that, based on "six pages of typed notes [provided by plaintiff] describing her symptoms," plaintiff had benign essential tremor, but not Parkinson's disease, and a "myofascial pain disorder, which seem[ed] to be familial."[3] (DE 10, p. 239) Dr. Ngo noted that plaintiff's pain was mostly in her neck, shoulder, and lower back. (DE 10, p. 239)

Dr. Ngo noted on February 3, 2010 that, based on plaintiff's complaints, she had "greater trochanteric bursitis,"[4] and familial benign essential tremor. (DE 10, p. 238) Dr. Ngo noted further that plaintiff had acid reflux disease, that she had been "diagnosed recently" with OSA (obstructive sleep apnea),[5] that she had dysphagia,[6] that she had undergone a thymectomy,[7] that her tremors

---

[1] Encephalopathy – "any degenerative disease of the brain." *Dorland's Illustrated Medical Dictionary* 614 (32nd ed 2012).

[2] Myofascial – "pertaining to or involving the fascia ["a sheet or band of fibrous tissue such as lies deep to the skin or forms an investment for muscles and various organs of the body"] surrounding and associated with muscle tissue." *Dorland's* at 679, 1223.

[3] Familial – "occurring in or affecting more members of a family than would be expected by chance . . . ." *Dorland's* at 678.

[4] Trochanteric bursitis – Trochanteric, "either of the two [bony] processes [prominence or projection] below the neck of the femur"; bursitis, "inflammation of the bursa ["a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop]" at "either of the two [bony] processes below the neck of the femur." *Dorland's* at 262, 264,1517, 1970.

[5] Obstructive Sleep Apnea – "sleep apnea ['cessation of breathing'] resulting from the collapse or obstruction of the airway . . . ." *Dorland's* at 116-17.

[6] Dysphagia – "difficulty in swallowing." *Dorland's* at 579.

[7] Thymectomy – "surgical removal of the thymus gland." *Dorland's* at 1924.

continued as did her neck, shoulder, and lower back pain, and that sciatica continued as a "chronic issue."  (DE 10, p. 238)

• <u>Four imaging reports from Premier Diagnostic Imaging (Premier Diagnostics) for the period June 16, 2008 to August 25, 2009</u>.  (DE 10, pp. 242-45)  An MRI of the brain and a KUB (kidney, ureter, and bladder) x-ray were normal/negative.

• <u>The records of Dr. Joseph Tokaruk, M.D. for the period January 11, 2010 to February 16, 2010</u>. (DE 10, pp. 246-66) Dr. Tokaruk's report of February 16, 2010 stated that, based on his tests, it was "highly unlikely that [plaintiff] ha[d] primary adrenal insufficiency."  (DE 10, p. 247)  The associated laboratory/clinical tests all were either normal or unremarkable.  (DE 10, pp. 251-66)

• <u>St. Thomas Heart records for the period July 9, 2008 to January 27, 2010</u>.  (DE 10, pp. 267-71)  An electrocardiogram (EKG) conducted on July 9, 2008 was "[e]ssentially unremarkable." (DE 10, p. 271)  Impressions noted by Dr. Joel Tanedo, M.D. on August 15, 2008 based on plaintiff's complaints included syncope,[8] possibly neurological in origin, premature atrial contractions, hypertension, obesity, and dizziness.  (DE 10, pp. 268-69)  An EKG conducted on January 27, 2010 revealed "Grade 1 diastolic dysfunction,"[9] and "mild pulmonary hypertension."[10] (DE 10, p. 267)

• <u>Upper Cumberland Pulmonary Group records for April 13, 2009</u>.  (DE 10, pp. 272-78) A chest x-ray did not reveal any acute cardiopulmonary pathology, and the results of a

---

[8] Syncope . . . "a temporary suspension of consciousness . . . also called a [f]aint." *Dorland's* at 1818.

[9] Grade I diastolic dysfunction – Abnormal relaxation, and the mildest form of diastolic heart failure. *See* www.news-medical.net/health/Diatolic-Dysfunction-Diagnosis.aspx.

[10] Pulmonary hypertension – "increased pressure . . . within the pulmonary arterial circulation." *Dorland's* at 897.

cardiopulmonary exercise test indicated that complaints of dyspnea[11] "may be related to deconditioning, obesity, and early fatigue during exercise."  (DE 10, pp. 275-76)

•   The records of Dr. Jeff Crosier, M.D. for the period June 4, 2009 to November 18, 2009. (DE 10, pp. 279-91)  Dr. Crosier's assessments during this period were GERD,[12] irritable bowel syndrome (IBS), hypothyroidism,[13] and polymyalgia rheumatica and not fibromyalgia.[14] (DE 10, pp. 279-83)  An abdominal ultrasound conducted on August 4, 2009, and colonoscopy conducted on August 10, 2009, were essentially normal.  (DE 10, pp. 284, 286, 288)  Esophageal biopsies supported Dr. Crosier's GERD assessment, but were negative for gastric mucosa,[15] Barrett's metaplasia,[16] dysplasia,[17] infectious organisms, IBS, and colitis.  (DE 10, pp. 290-91)

•   The records of Dr. David Seitzinger, M.D. for the period May 6, 2008 to January 27, 2010.  (DE 10, pp. 293-438)  Dr. Seitzinger completed a chest pain questionnaire on March 16, 2010 (DE 10, pp. 293-96) in which, based on plaintiff's inputs, he noted that plaintiff "sometimes" had sharp chest pain around the sternum, that the pain lasted approximately one minute, that the pain did not radiate, that neither rest nor nitroglycerin relieved the pain, and that the pain brought on nausea,

---

[11]  Dyspnea . . . "breathlessness or shortness of breath, difficult or labored respiration."  *Dorland's* at 582.

[12]  GERD (gastroesophageal reflux disease) – "[a] chronic digestive disease that occurs when stomach acid or, occasionally, bile flows back (refluxes) into [the] food pipe (esophagus)."  *See MayoClinic.Com/health/gerd/DS00967*.

[13]  Hypothyroidism – "deficiency of thyroid activity . . . ."  *Dorland's* at 907.

[14]  Polymyalgia rheumatica – "a syndrome in the elderly characterized by proximal joint and muscle pain." *Dorland's* at 1490; Fibromyalgia – "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points," *Dorland's* at 703.

[15]  Gastric mucosa –The mucous membrane layer in the stomach.  *See Dorland's* at 1186.

[16]  Barrett's metaplasia – An abnormal change (metaplasia) in the cells of the lower portion of the esophagus. *See Dorland's* at 636.

[17]  Dysplasia – "abnormality of development . . . alteration in size, shape, and organization of adult cells." *Dorland's* at 579.

vomiting, and sweating (DE 10, p. 293).  Dr. Seitzinger also noted in the questionnaire that plaintiff had a Grade 1 diastolic dysfunction, pulmonary hypertension and a history of deep vein thrombosis.[18] (DE 10, p. 293)

The accompanying patient treatment summaries show that Dr. Seitzinger saw plaintiff numerous times for numerous complaints during this period.  (DE 10, pp. 303-70)  The accompanying laboratory/clinical records show that plaintiff had a Grade I diastolic dysfunction, mild pulmonary hypertension, a vitamin D deficiency, low iron, slight hypoglycemia,[19] and high cholesterol. (DE 10, pp. 371, 396-99, 408-09, 424, 432)  However, other laboratory/clinical records during this period show that plaintiff had no evidence of "acute pulmonary embolus,"[20] "[n]o acute pulmonary process" with respect to her complaints of dyspnea (DE 10, p. 377), a normal liver scan (DE 10, p. 378), a negative KUB (DE 10, p. 379), "[n]o significant abnormality" in a CT scan of her abdomen and pelvis (DE 10, pp. 380, 387), "[n]o significant abnormality" in a gallbladder ultrasound (DE 10, p. 382), a "[n]ormal contrast-enhanced MRI of the brain" (DE 10, p. 383), a "[n]ormal" chest x-ray for dyspnea (DE 10, p. 385), a "[n]ormal" doppler arterial ultrasound of the right lower extremity" (DE 10, p. 386), a normal CT scan of the abdomen and pelvis (DE 10, p. 387), an unremarkable esophagogastroduodenoscopy (EGD)[21] (DE 10, pp. 390–91), negative test for

---

[18]  Deep vein thrombosis – "thrombosis of one or more deep veins, usually on the lower limb, characterized by swelling, warmth, and erythema; it is frequently a precursor of pulmonary embolism."  *Dorland's* at 1923. "Thrombus" is "a stationary blood clot along the wall of a blood vessel." *Dorland's* at 1923.

[19]  Hypoglycemic – "an abnormally diminished concentration of glucose in the blood." *Dorland's* at 902.

[20]  Embolus – "a mass, which may be a blood clot or some other material . . . obstructing circulation." *Dorland's* at 606.

[21]  Esophagogastroduodenoscopy – "endoscopic examination of the esophagus, stomach, and duodenum." *Dorland's* at 648.

Cushing's disease[22] (DE 10, pp. 392-95), negative surgical pathology for gastric mucosa, Barrett's metaplasia, dysplasia,[23] infectious organisms, inflammatory bowel disease (IBD), and colitis,[24] (DE 10, pp. 402-03), negative microbiology tests (DE 10, pp. 404-07), negative for Lupus, Sjören,[25] and arthritis (DE 10, pp. 422-27, 433-38).

• <u>Records from the Cookeville Regional Medical Center (Cookeville Regional) for the period January 14, 1990 to January 31, 2007</u>. (DE 10, pp. 439-786) Plaintiff was seen at Cookeville Regional numerous times for multiple complaints during this period. Laboratory/clinical tests pertaining to plaintiff's thyroid problems, blood work, and urinalyses consistently exhibited some deviation from the norm. (DE 10, pp. 444, 450, 475-76, 485-86, 497, 504, 526-27, 532-34, 542-43, 557-58, 570, 574, 584-86, 591, 597-99, 620, 628-30, 666-67, 674-76, 683, 691-92, 695, 702-03, 706, 710, 714-15, 732, 734-35, 739) However, tests for plaintiff's specific, recurring complaints were near-universally unremarkable, normal or negative. (DE 10, pp. 452, 458, 474, 489-90, 492, 505, 510, 514-17, 539, 551, 553, 559, 561-62, 564, 566, 568, 572, 576-78, 580-82, 588, 594-95, 602, 623-24, 631-32, 634-35, 637, 639, 642, 650, 652, 655-57, 659, 664, 668-69, 671-73, 679-81, 694, 698, 711-12, 719) Those unremarkable/normal/negative test results for which written assessments were provided included: normal x-ray/radiograph examination of the chest (heart, lungs, and bony structures) (DE 10, pp. 458, 474, 535, 650, 681), normal EKG (DE 10, pp. 489-90, 632, 711-12, 759,

---

[22] Cushing's disease – A rare hormonal disorder caused by prolonged exposure of the body's tissues to high levels of the hormone cortisol. *See Dorland's* at 531.

[23] Dysplasia – "abnormality of development . . . in size, shape, and organization of adult cells." *Dorland's* at 579.

[24] Colitis – "inflammation of the colon." *Dorland's* at 384.

[25] Sjören – a chronic autoimmune disease in which a person's white blood cells attack their moisture-producing glands. *See* www.sjorgren.org/home/about-about sjogren's.

772), normal renal scan study (DE 10, p. 492), normal images of paranasal sinuses (DE 10, pp. 510, 566), normal pulmonary function test (DE 10, p. 514-15), normal pelvic ultrasound (DE 10, p. 539), normal x-ray examination of cervical spine (DE 10, p. 551), negative MRI of the head and brain (DE 10, pp. 553, 668, 776), normal x-ray examination of the lumbar spine (DE 10, p. 561), normal/negative gallbladder imaging (DE 10, pp. 562, 568), normal CT scan of the abdomen and pelvis (DE 10, pp. 580, 655), no acute cardiopulmonary pathology (DE 10, p. 588), normal ultrasound of pancreas, aorta, inferior vena cava, kidneys, spleen, gallbladder and liver (DE 10, p. 602), normal nuclear lung ventilation perfusion[26] scan (DE 10, p. 623), no acute cardiopulmonary process (DE 10, pp. 631, 637), normal upper GI examination of esophagus, stomach, and small bowel (DE 10, p. 639), normal hepatobiliary[27] scan (DE 10, p. 652), normal doppler arterial ultrasound of the right lower extremity (DE 10, p. 679), normal cardiac catheterization ("patient's stress nuclear study was a false-positive study")(DE 10, p. 690), negative venous doppler examination of lower right extremity ("no evidence of deep venous thrombosis")(DE 10, p. 719), normal barium swallow test (DE 10, p. 737), polysomnography[28] test revealed minimal evidence of OSA (DE 10, pp. 748-50), polysomnogram report to evaluate hypersomnolence[29] "well within normal limits" ("[f]urther treatment for [OSA] not required") (DE 10, pp. 778-80).

• The record of consulting physician Dr. Donita Keown, M.D. dated June 3, 2010. (DE 10, pp. 787-89) Dr. Keowan opined that plaintiff could: "sit 8 hours in an 8-hour day, walk or stand

---

[26] Perfusion – "the act of pouring . . . through . . a specific organ." *Dorland's* at 1410.

[27] Hepatobiliary – "pertaining to the liver and the bile or the bile ducts." *Dorland's* at 846.

[28] Polysomnography – "the . . . recording during sleep of multiple physiologic variables . . . related to the state and stages of sleep, to assess possible biological causes of sleep disorders." *Dorland's* at 1494.

[29] Hypersomnolence – "excessive sleeping or sleepiness . . . ." *Dorland's* at 896.

8 hours in an 8-hour day, and lift 30-35 pounds occasionally, and 10 to 15 pounds on a more frequent basis." (DE 10, p. 789) During an otherwise unremarkable exam, Dr. Keown noted that plaintiff "appears to be dramatizing what may be a tremor; however, after the examination, I am not seeing a tremor at all." (DE 10, p. 788) Dr. Keown noted later in her report that "[d]uring the evaluation, the claimant is exhibiting and maybe dramatizing a right and then left hand tremor . . . [but] no tremor following evaluation." (DE 10, p. 789)

- Residual functional capacity (RFC) assessment completed by Dr. Kanika Chaudhuri, M.D. on August 3, 2010. (DE 10, pp. 790-98) Concluding that Dr. Keown's maximum was too restrictive based on her own examination and the medical evidence of record (MER), Dr. Chaudhuri assessed plaintiff as capable of performing work requiring medium exertion (DE 10, p. 791), that she could climb without restrictions, balance, stoop, kneel, crouch, and crawl frequently (DE 10, p. 792). Dr. Chaudhuri further determined that plaintiff's only environmental limitation was to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (DE 10, p. 794) Based on the MER, Dr. Chaudhuri determined that plaintiff was only "partially credible." (DE 10, p. 795)

- Counsel-provided November 22, 2010 chest x-ray performed by the Imaging Center at Cookeville Regional (the Imaging Center). (DE 10, p. 799) The "impression" in the report was "no definite acute cardiopulmonary disease." (DE 10, p. 799)

- RFC completed by Dr. Frank Pennington, M.D. on February 8, 2011. (DE 10, pp. 800-05) Also noting that Dr. Keowan's medical assessment was too restrictive based on the objective findings at the time of the clinical evaluation, Dr. Pennington assessed that plaintiff was capable of performing work requiring medium exertion (DE 10, p. 801), that she could climb without restriction, balance, stoop, kneel, crouch, and crawl frequently (DE 10, p. 802). Dr. Pennington further determined that plaintiff's only environmental limitations were to avoid concentrated

exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation. (DE 10, p. 803) Finally, Dr. Pennington noted that, although plaintiff's "allegations are consistent and representative of the MDI's . . [the] . . . allegations appear disproportionate to the objective findings and are therefore only partially credible." (DE 10, p. 804)

• Counsel-provided medical records from the Putnam County Health Department records for the period March 23, 2011 to June 27, 2011. (DE 10, pp. 806-30) These records pertain to "a long list of things [plaintiff] want[ed] done " beginning March 23, 2011, *i.e.*, gallbladder, "cardio echo," "labs," "GI scope," hypothyroid, CHF, "leaky valve," etc.. (DE 10, p. 811)

• Counsel-provided medical records of Dr. Seitzinger for the period February 10, 2010 to December 2, 2010. (DE 10, pp. 833-79) Plaintiff presented for the following specific complaints during this period: back pain for which she wanted another MRI, empty sella[30] syndrome, sinusitis, "traumatic head injury" after being struck in the head with a T.V. remote, and dysfunctional gallbladder, for which surgery was later performed. (DE 10, pp. 838, 850, 852, 872) Laboratory/clinical reports during this period were negative for antinuclear antibodies[31] (DE 10, p. 862), unremarkable urine free cortisol test[32] (DE 10, p. 864), normal thyroid function tests (DE 10, pp. 867, 870), normal hormone tests (DE 10, p. 869), normal x-rays of left and right hips (DE 1-, pp. 873-74), "mild degenerative disease" in the lower back but "[n]o acute abnormalities" (DE 10, p. 875), "[p]artly empty sella otherwise nor[mal] . . . MRI of the brain" (DE 10, p. 877).

---

[30] Empty sella – Where "[t]he pituitary fossa [channel] appears empty, although the pituitary gland is present in a flattened form; pituitary hormone secretion may be normal, deficient, or excessive." *Dorland's* at 1829.

[31] Antinuclear antibodies are antibodies that mistakenly attack one's own body cells. A positive nuclear antibody test could mean the presence of an autoimmune disease such as lupus and/or rheumatoid arthritis. *See* www.mayoclinic.com/health/ana-test/MY00787.

[32] A test to determine whether there may be problems with the adrenal glands or the pituitary gland in assessing the possibility of Cushing's syndrome. *Dorland's* at 422; *see also* WebMD.com/a-to-z-guides/cortisol-in-urine.

• Counsel-provided medical records of  Dr. David Henson, M.D. for the period April 8, 2010 to December 1, 2010.  (DE 10, pp. 880-89)  Dr. Henson's assessment based on plaintiff's subjective complaints included: asthma, SOB,[33] dyspnea, osteoarthritis, GERD, hypertension, CHF, OSA, chronic pain, fatigue, myalgia, joint pain, numbness, allergies, and sinusitis.  (DE 10, pp. 882-83)  Hematology studies during this period were normal (DE 10, p. 884), and imaging studies in 2009 and 2010 were unremarkable/negative for cardiopulmonary pathology (DE 10, pp. 886, 888).

• Counsel-provided medical records from St. Thomas Heart in Nashville for the period January 27, 2010 to November 19, 2010.  (DE 10, pp. 890-99)  Test results showed Grade I diastolic dysfunction, "[m]ild" pulmonary hypertension, and high cholesterol.  (DE 10, pp. 894-95)

• Counsel-provided medical records of Dr. Jeff Crosier, M.D. for the period March 30, 2010 to May 23, 2011.  (DE 10, pp. 900-06)  Dr. Crosier assessed plaintiff with GERD with squamous papilloma,[34] constipation, and asthma.  (DE 10, p. 900)  Imaging suggested a "possibility of dysfunctional gallbladder" (DE 10, p. 901), but an ultrasound of the abdomen showed "[n]o significant abnormality" (DE 10, p. 902), normal upper GI endoscopy and pathology (DE 10, pp. 903-05).  The other included laboratory/clinical test results were normal/unremarkable.  (DE 10, pp. 901-06).

• Counsel-provided consultative exam of Dr. Melvin Blevins, M.D. dated October 5, 2011. (DE 10, pp. 907-16)  Dr. Blevins opined that plaintiff was "unable to perform the duties of gainful employment at this time," and was "[i]ncapable of even 'low stress jobs.'"  (DE 10, pp. 907, 912)

• Counsel-provided medical records from Vanderbilt University Medical Center

---

[33] SOB – "shortness of breath."  *Dorland's* at 2123.

[34] Squamous papilloma – "benign . . . projections from the epithelial [covering of internal surfaces including body cavities] surface . . . such as commonly occurs in the oral cavity."  *Dorland's* at 636, 1372.

(Vanderbilt) for the period August 11, 2010 to September 13, 2011. (DE 10, pp. 917-32) Plaintiff was referred to Dr. Andrea Utz, M.D. , Ph.D. at Vanderbilt for a "partially empty sella." (DE 10, pp. 929-31) Subsequent evaluation of the sella proved normal, with no requirement for "further imaging." (DE 10, p. 922) Subsequent to a referral from Dr. Utz, "Dr. Patrick Lavin, M.D. reported on September 13, 2011 that plaintiff's "general neurologic examination was normal except for tremor." (DE 10, p. 918)

•  Counsel-provided records of the Imaging Center dated January 30, 2012 and from Premier Diagnostics dated May 11, 2012. (DE 10, pp. 933-34) An x-ray series made by the Imaging Center of plaintiff's lumbar spine was unremarkable. (DE 10, p. 934) An MRI performed by Premier Diagnostics indicates "[d]egenerative disc changes at L3-4 and L5-S1," with "[m]ild disc space narrowing . . . at L5-S1," "[n]o evidence of a herniated disc," and "[m]ild posterior right paracentral[35] disc bulge at L5-S1." (DE 10, p. 933)

### B.  Transcript of the Hearing

### 1.  General

Plaintiff's hearing was held before ALJ Dickson-Grisom on November 1, 2011. (DE 10, pp. 31-44) Plaintiff was represented by counsel at the hearing.

### 2.  Plaintiff's Testimony

Plaintiff testified that she was forty-eight years of age at the time of the hearing, that she was divorced and lived alone, that she completed high school, that she had been employed as a "factory assembly" worker and cashier, that she had worked at WalMart in the shoe department in retail sales, and that she did housework. (DE 10, pp. 35-36) Plaintiff testified that she still drove herself to the grocery store, church, and to doctor appointments, but that her aunt drove her sometimes as well.

---

[35]  Paracentral – "near the center." *Dorland's* at 1374.

(DE 10, p. 37)

On questioning by counsel, plaintiff testified that it was "a combination of all" her conditions that affected her rather than one condition more than another. (DE 10, p. 38) Plaintiff testified that she had all of her current problems in 2007 when she saw Dr. Noel,[36] a neurologist, in 2007. (DE 10, p. 38) According to plaintiff, Dr. Noel determined through testing that plaintiff suffered from "central tremor." (DE 10, p. 38)

Plaintiff testified that the tremor affected her in a lot of ways such as poking herself in the eyes when putting in her contacts, and dropping her pills. (DE 10, p. 39) She testified further that the tremor was constant, that it became worse when she became nervous and after her "breathing treatments," and that it affected "[p]retty much" her whole body, but the tremor was worse in her arms. (DE 10, p. 39)

Next, plaintiff testified that she suffered from sciatica "[p]retty much all of the time," and characterizing the pain as "severe," described it as "run[ning] from [her] hip down to [her] ankle to [her] foot." (DE 10, p. 39) According to plaintiff, she "sometimes" had to "get shots . . . for the pain," and it "[s]ometimes . . g[ot] infected or inflamed or something." (DE 10, p. 39)

Plaintiff testified that she was diagnosed with fibromyalgia thirteen years earlier at St. Thomas Hospital, and more recently by Dr. Noel. (DE 10, p. 40) According to plaintiff, the fibromyalgia "worsened over time" resulting in a "poor quality of life." (DE 10, p. 40) She testified that she had a "hard time blow-drying . . . and washing [her] hair," that her movements were accompanied by "[b]urning pain . . . [m]uscle aches and pains," and that medication did not help. (DE 10, pp. 40-41)

---

[36] There are no medical records for a "Dr. Noel" in the administrative record. It appears that plaintiff's reference is to Dr. Ngo.

## 2.  The VE's Testimony

At the conclusion of counsel's questioning, the ALJ asked the VE to summarize plaintiff's work history.  (DE 10, p. 41)  The VE testified that plaintiff's work history ranged from light, unskilled work to light, semi-skilled work.  (DE 10, p. 41)

The ALJ asked the VE to consider the following hypothetical: 1) light work; 2) precluded from exposure to hot and cold temperature extremes; 3) precluded from working around dust, smoke, chemicals, fumes, and noxious gases.  (DE 10, p. 42)  The VE testified that the individual could work as a cashier, an assembler, and retail sales clerk, but that housekeeping would be eliminated because of the environmental restrictions.  (DE 10, p. 42)  The ALJ then asked the VE to consider alternative positions for the same individual, to which the VE testified that the individual would be able to work as a "[c]onduction inspector," "[h]and packer," and "production laborer," all of which were available in substantial numbers in both the local and national economy.  (DE 10, p. 42)  The VE testified that the same jobs would be available if the element of pain were changed from mild to moderate, but that severe pain would render the individual unemployable, as would a combination of impairments that would prevent the person from working an eight-hour day, five-day work week on a regular basis.  (DE 10, p. 43)

## C.  The ALJ's Notice of Decision

The ALJ entered an unfavorable decision on January 31, 2012.  (DE 10, pp. 25-34)  The ALJ's findings of fact and conclusions of law are summarized below:

> The claimant meets the insured status requirements of the Act through December 31, 2014.  (DE 10, ¶ 1, p. 21)
>
> The claimant has not engaged in substantial gainful activity since August 28, 2009, the alleged onset date.  (De 10, ¶ 2, p. 21)
>
> The claimant has the following severe impairments: fibromyalgia,

14

heart, thyroid, sciatic nerve, pulmonary, back, esophagus, and hypertension. (DE 10, ¶ 3, p. 21)

The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (DE 10, ¶ 4, p. 22)

After careful consideration of the entire record, the undersigned finds that the claimant has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that she can stand for 6 hours in an 8-hour workday with normal breaks, that she can frequently lift 10 pounds and occasionally lift 20 pounds, and that she must avoid exposure to temperature extremes and pulmonary irritants such as dust odors, fumes, and gases. (De 10, ¶ 5, pp. 22-25)

The claimant is capable of performing past relevant work as a production assembler (light, unskilled), cashier (light, unskilled), retail sales person (light, semiskilled, and housekeeper (light, unskilled). This work does not require the performance of work-related activities precluded by claimant's RFC. (DE 10, ¶ 6, p. 25)

The claimant has not been under a disability as defined in the Act from August 28, 2009 through the date of this decision. (DE 10, ¶ 7, p. 26)

## III. ANALYSIS

### A. Administrative Proceedings Below

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process described below to determine whether an individual is "disabled" within the meaning of the Act.

First, the claimant must demonstrate that she has not engaged in substantial gainful activity during the period of disability.

Second, the claimant must show that she suffers from a severe medically determinable physical or mental impairment.

Third, if the claimant shows that her impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then she is deemed disabled.

Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform her past relevant work, in which case the claimant is not disabled.

Fifth, the ALJ determines whether, based on the claimant's RFC, as well as her age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)(internal citations omitted); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). The claimant bears the burden of proof at steps one through four. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). The burden then shifts to the Commissioner at step five "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The SSA's burden at the fifth step may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics in the applicable grid rule. *See Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)).

In determining the RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *see Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

## B.  Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the findings of fact are supported by substantial evidence in the record, and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Key v. Callahan* 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 10 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *His v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). In other words, if the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. 42 U.S.C. §§ 405(g), 1383(c); *Key*, 109 F.3d at 273.

## C.  Claims of Error

### 1.  Whether the ALJ Erred in Rejecting
### the Opinion of Dr. Blevins
### (DE 15, ¶ II.1, pp. 24-25)

Plaintiff asserts that Dr. Blevins "consultatively examined" her on October 5, 2001, diagnosing her with: fibromyalgia syndrome, severe and recurrent migraine headache syndrome, congestive heart failure, and benign tremor involving both hands and the head. Dr. Blevins concluded that plaintiff was restricted to less than sedentary work as well as limited fingering and

feeling. (DE 10, p. 913) Plaintiff argues that Dr. Blevins's "findings are sufficiently supported by his examination and the evidence of record," in particular the records of Drs. Ngo and Henson.

Social Security regulations classify "acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Dr. Blevins is a nontreating but examining source because he examined plaintiff once. *See* 20 C.F.R. § 404.152. In assessing the weight to give to nontreating but examining sources, the Commissioner examines the examining relationship, or lack thereof, specialization of the source, consistency with the rest of the record, and supportabilty of the opinion in the related documentation provided. 20 C.F.R. § 404.1527(c); *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013). Whereas the ALJ is required to give a "good reason" for declining to give controlling weight to a treating source, the ALJ is not required to give "good reason" for the weight given to the opinion of a nontreating but examining source. *See Ealy v. Comm'r of Soc. Sec.*, 549 F.3d 504, 514-15 (6th Cir. 2010).

The ALJ noted the following with respect to Dr. Blevins's October 5, 2011 assessment of plaintiff's physical ability to do work-related activities:

> **Dr. Blevins performed a one-time examination of the claimant at [the] request of her attorney . . . . The claimant provided a long list of ailments that she thought prevented her from performing normal daily work activities.** She noted degenerative disc disease and possible unspecified tissue disorder causing myofascial and radicular pain. She reported heart and artery problems since 2007, possibl[y] causing congestive heart disease and migraine headaches. The claimant maintained that she had respiratory difficulties attributable to asthma and reactive airway disease. She described a gait and balance impairment associated with tremors affecting her head and both lower and upper extremities with possible indication of MS or Parkinson's disease. The claimant related that she had chronic abdominal pain with history of Barrett's esophagus and gallbladder problems. Considering the claimant's multitude of subjective complaints, Dr. Blevins limited the claimant to be less than

sedentary work and maintained that the claimant would be absent from work four or more days during a normal month of work.

(DE 10, p. 25)(emphasis added)   The ALJ wrote the following with respect to Dr. Blevins's assessment above:

> **The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant; and he uncritically accepted as true most, if not all, of what the claimant reported.** . . .   The undersigned notes that **the claimant underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence** for the current appeal.  **Further, the doctor apparently received monetary payment for the report**.  Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored.

(DE 10, p. 22)(emphasis added)

The ALJ considered the relationship between Dr. Blevins and plaintiff tacitly when he wrote: "Dr. Blevins performed a one-time examination of the claimant at [the] request of her attorney"; "the claimant underwent the examination that formed the basis of [Dr. Blevins's] opinion . . . not in an attempt to seek treatment . . . but . . . through attorney referral . . . in . . . an effort to generate evidence"; "the doctor apparently received monetary payment for the report" as opposed to payment for treatment.  The record is clear on its face that the relationship between Dr. Blevins and plaintiff was not a doctor-patient relationship in the traditional sense.  The first factor is entitled to little or no weight for these reasons.

The next factor is based on whether Dr. Blevins was a specialist.  A reasonable interpretation of the term "specialist" in the field of medicine is one who has devoted himself to a single area of medical practice, or perhaps two interrelated areas at the most.  The contents of Dr. Blevins's consultative report shows that Dr. Blevins could not have been reporting as a specialist.  The sheer

number of alleged symptoms and areas of medicine involved made that an impossibility.[37] Neither can Dr. Blevins be viewed as a specialist by writing that plaintiff was "unable to perform the duties of gainful employment at this time." The question of disability, and a claimant's ability to work, is a decision reserved to the Commissioner, who has exclusive authority in determining the question of "disability" – not Dr. Blevins. 20 C.F.R. § 404.1527(d)(1). For the reasons explained above, the second factor also is entitled to little or no weight.

The third factor is whether Dr. Blevins's opinion was consistent with the medical record overall. Generally speaking, the medical records, summarized *supra* at pp. 2-12, fall into two basic categories. First, there are doctors' diagnoses, impressions, and assessments based on what plaintiff told them, including what plaintiff told them that other doctors had told her. Second, there are laboratory/clinical tests/evaluations related to those diagnoses, impressions, and assessments. A fair assessment of the two is that, although the diagnoses, impressions, and assessments support plaintiff's medical claims on their face, the related laboratory/clinical tests/evaluations do not. More particularly, as shown *supra* at pp. 4-12, the related laboratory/clinical tests/evaluations were unremarkable, normal or negative in virtually every instance.

Plaintiff argues that Dr. Blevins's opinion is supported by Dr. Ngo's August 21, 2009 report, discussed *supra* at p. 3. Plaintiff overlooks the fact that Dr. Ngo's August 21, 2009 report is not supported by any laboratory/clinical tests/evaluations. On the contrary, it is based entirely on his review of "six pages of typed notes from [plaintiff] describing her symptoms." Plaintiff also argues that Dr. Ngo's January 10, 2010 exam,[38] *supra* at pp. 3-4, showed "prominent benign tremor,

---

[37] Dr. Blevins actually practices family medicine in Smithville, Tennessee.

[38] The examination on p. 238 of the administrative record to which plaintiff refers actually is Dr. Ngo's February 3, 2010 report.

exacerbated by stress." As previously discussed, *supra* at pp. 8-9, Dr. Keown observed the following in her June 3, 2010 examination: plaintiff "appears to be dramatizing what may be a tremor; however, after the examination, I am not seeing a tremor at all"; "[d]uring the evaluation, the claimant is exhibiting and maybe dramatizing a right and then left hand tremor "; "no tremor following evaluation." Dr. Keown's observation is supported by the fact that the brain scan conducted on May 19, 2008 (DE 10, p. 383) in connection with plaintiff's "tremor" was "normal."

Plaintiff also argues that Dr. Henson assessed her with "asthma, shortness of breath, dyspnea, osteoarthritis, GERD, hypothyroidism, CHF, chronic pain, hypertension, fatigue, myalgia, joint pain and numbness." (DE 10, p. 883) The assessment to which plaintiff refers is a handwritten document completed – once again – based on plaintiff's subjective complaints at that time. It is not supported by any medically determinable evidence. As previously discussed, *supra* at pp. 4-12 and above, diagnoses, impressions, and assessments such as those attributed to Dr. Henson are near-universally <u>not</u> supported by related laboratory/clinical tests/evaluations.

As shown above, Dr. Blevins's opinion is not supported by medically determinable evidence on the record, nor does plaintiff's comparison of Dr. Blevins's report with those of Drs. Ngo and Henson make any difference given that their opinions are not supported by medically determinable evidence on the record. The third factor is entitled to little or no weight.

The fourth and final factor is supportabilty of the opinion based on the related documentation provided with the opinion. Dr. Blevins's ten-page written opinion consists of two parts. The first part is written report consisting of plaintiff's medical history, a review of plaintiff's symptoms, a cursory physical examination, and list of impressions that track plaintiff's medal claims with near perfect correlation. The second part is an attached six-page medical source statement with exertional limitations based on the foregoing examination. The validity of the second part of the opinion, *i.e.*,

the medical source statement, is dependent on the validity of Dr. Blevins's written opinion.

A review of Dr. Blevins's <u>written opinion</u> reveals the following: he makes no reference whatsoever to any of the medical records that constitute those in this case; his medical impressions are based solely on plaintiff's subjective complaints; he conducted no independent testing to corroborate his medical impressions; his medical impressions proceed in virtual lock-step with plaintiff's subjective complaints; the results of his actual physical examination of plaintiff do not support his conclusion that plaintiff is "unable to perform the duties of gainful employment at this time." In short, there is nothing in Dr. Blevins's written opinion that supports either his written opinion as to plaintiff's ability to work, or the accompanying medical source statement.

Turning to the medical source statement itself, Dr. Blevins is asked several times to provide the "medical/clinical findings" on which he based his assessment. (DE 10, pp. 912-14) Dr. Blevins's written responses are illegible in every instance, although using some imagination his responses appear to refer to his medical impressions and not to any medical or clinical findings. As noted above, the results of Dr. Blevins's physical examination do not support his underlying conclusion regarding plaintiff's ability to work or, as stated in the source statement, that she was "[i]ncapable of even 'low stress jobs.'" (DE 10, p. 912) Finally, given that Dr. Blevins only saw plaintiff the one time, it is apparent that his assessments of intensity, persistence, and limiting effects are based, once again, solely on plaintiff's input.

For the reasons explained above, Dr. Blevins's opinion is unsupported by any information contained within the opinion itself. Accordingly, the fourth factor is entitled to little or no weight.

For the reasons explained above, Dr. Blevins's opinion was entitled to little or no weight. That is the weight the ALJ obviously gave it, and his decision to do so is supported by substantial evidence on the record. As previously noted, the ALJ was not required to give a "good reason" for

22

rejecting the opinion of a non-treating but examining source. His explanation of the circumstances

surrounding the one-time examination was sufficient. Plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Erred/Lacked Clarity in Assessing Plaintiff's Credibility (DE 15, ¶ II.2, pp. 25-26)

Plaintiff argues that the ALJ's credibility determination lacked clarity because the ALJ wrote

that plaintiff's "complaints of pain [are] credible," but then proceeded to delineate plaintiff's daily

activities that were inconsistent with that statement. The portion of the ALJ's decision at issue is

quoted below.

> **The degree of the claimant's complaints of pain are credible**. The claimant cares for personal needs and provided food and water for her three cats and one dog. She prepares simple meals and does light household chores. She washes dishes; sweeps; and cleans her bathtub. She drives a car and shops for groceries. She manages a checkbook and pays her bills. The claimant watches television and reads for enjoyment. She talks on the phone (Exhibit 6E).[39] Her ability to perform such a variety of daily activities tends to negate the credibility of her subjective complaints, especially the degree of pain she maintained [s]he experiences. One would not reasonably anticipate that a person who experiences drowsiness and side effects from medications, the degree of pain alleged, or severe depression and anxiety, to be able to tolerate the physical demands, the level of concentration, or the amount of social interaction, necessary to perform many of these activities.

(DE 10, p. 25)(emphasis added) The foregoing statement was made in the context of the ALJ's RFC

analysis, in which he noted earlier that "the claimant's statements concerning the intensity,

persistence and limiting effects are **not** credible to the extent that they are inconsistent with the above

residual functional capacity assessment." (DE 10, p. 23)(emphasis added)

The Commissioner argues that the highlighted sentence on the preceding page is an obvious

---

[39] Exhibit 6E is the Adult Functioning Report to which the ALJ referred.

typographical error inasmuch as the ALJ proceeded in the next sentence to delineate those daily activities that called plaintiff's credibility into doubt. The Magistrate Judge agrees. Evidence in support of the Commissioner's typographical-error argument is found in the ALJ's earlier related statement quoted in the last sentence in the paragraph above. Taking the two statements together, along with the ALJ's lengthy discussion of plaintiff's daily activities, it is obvious that the ALJ's statement that plaintiff's complaints of pain <u>are credible</u> is a typographical error. *See Gribbins v. Comm's Soc. Sec. Admin.*, 37 Fed.Appx. 777, 779 (6th Cir. 2002)("the district court d[id] not err in finding a mere typographical error in the ALJ's second statement regarding residual functional capacity"); *see also, Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993)(citing *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980)("[t]he findings and conclusions of the Commissioner are reviewed . . . in the context of the record as a whole"). This part of plaintiff's second claim of error is without merit.

The second part of plaintiff's argument is that the ALJ failed to "address the record as a whole in rejecting [plaintiff's] reports of pain." (DE 15, p. 25) This argument lacks an arguable basis in fact. The ALJ addressed each part of the medical record source by source in his RFC analysis. (DE 10, pp. 23-25) Moreover, as previously discussed, although the medical record abounds with the diagnoses, impressions, and assessments of plaintiff's numerous doctors, the accompanying laboratory/clinical tests/evaluations simply do not support those diagnoses, impressions, and assessments, nor do they support plaintiff's claims that the combined effects of her alleged medical problems are disabling. Accordingly, the second part of plaintiff's second claim of error is without merit as well.

The typographical error in the ALJ's decision was harmless. Moreover, the ALJ did, in fact, address the medical evidence on the record in his analysis. Finally, the ALJ's RFC determination

24

was supported by substantial evidence on the record.  Accordingly, plaintiff's second claim of error is without merit.

## IV.  RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the record (DE 14) be **DENIED,** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 3rd day of September, 2013.


/s/Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge